IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEFFREY D. LEISER,

     Plaintiff,

   v.

DR. KARL HOFFMAN, et al.,

     Defendants.

OPINION and ORDER

Case No.  18-cv-277-slc

     *Pro se* plaintiff Jeffrey Leiser is incarcerated by the Wisconsin Department of Corrections (DOC), and since his incarceration, various DOC officials have responded to his need for pain management and treatment for his chronic back pain and chest pains.  In this case, Leiser is proceeding on claims that between 2016 and 2018, when he was incarcerated at New Lisbon Correctional Institution (NLCI), five health care providers demonstrated deliberate indifference to his need for medical care for his back pain and heart-related issues, in violation of his Eighth Amendment rights.  Before the court are Leiser's objection to defendants' expert witnesses (dkt. 31), and defendants' motion for summary judgment (dkt. 32).

     The evidence of record establishes that each of the defendants consistently provided Leiser with medical care, much of which Leiser claims to be inadequate.  However, the record does not support a reasonable finding that any defendant's handling of Leiser's chronic back pain and reported chest pains violated Leiser's constitutional rights.  Accordingly, all defendants are entitled to judgment in their favor on the merits.  I am denying Leiser's objection to defendants' expert witness disclosure as moot.

1

UNDISPUTED FACTS[1]

## A. The Parties

Plaintiff Jeffrey Leiser currently is in the custody of the Wisconsin Department of Corrections (DOC), at Redgranite Correctional Institution (Redgranite), but his claims arise from events that took place between 2016 and 2018 when he was incarcerated at NLCI.  The NLCI employees against whom he is proceeding are Dr. Karl Hoffman, Nurses Toni Johnson,[2] Koreen Frisk, Nicole Krahenbuhl,[3] and Health Services Manager (HSM) Jamie Barker.

At NLCI, nursing staff are responsible for the initial triage of prisoners' medical issues or concerns.  Given that the institution houses approximately 1,030 prisoners and employs only one full-time physician, it is necessary for nursing staff to handle patient concerns that do not require attention from a doctor, and to triage patient concerns to ensure the doctor is seeing patients with the most urgent medical care.

In her capacity as HSM, Barker coordinates with the primary care physician, dentist, psychiatrist, and specialists that work as consultants to the Bureau of Health Services (BHS) to streamline prisoner health care.  The HSM provides overall administrative support to the Health Services Unit (HSU); the day-to-day role does not involve evaluating, diagnosing, determining a course of treatment, prescribing medications, or direct patient care.  During the timeframe of Leiser's complaint, Barker was NLCI's interim HSM.

---

[1]  Unless otherwise noted, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to Leiser as the non-moving party.

[2]  Johnson's employment at NLCI ended in August of 2017.

[3]  Krahenbuhl's employment at NLCI ended in October 2018.

**B.  Leiser's Treatment from November 2016 to Early 2018**

### 1.  Leiser's First Complaints to Dr. Hoffman about his Pain Medication

On November 3, 2016, Leiser was seen in the HSU by a nurse for his complaints of headaches, eye pain, and neck pain.  Leiser complained that his pain was worsening, the muscle rub and meloxicam prescribed to him at that point were not working, and that he was "eat[ing] Tylenol like candy."  (Ex. 1000 (dkt. 35-1) 29-30.)  On November 4, 2016, Dr. Hoffman examined Leiser for his neck pain.  Leiser complained that the pain in his neck and right arm was his primary concern, but he also reported back and testicle pain, which worsened when he was lying down.  Dr. Hoffman decided to try a different medication, switching Leiser from meloxicam to naproxen, to see if a different nonsteroidal anti-inflammatory drug (NSAID) would work better for him.  Leiser claims that he told Hoffman that naproxen did not work for him, but Hoffman prescribed it nonetheless.  (Leiser Aff. (dkt. 46) ¶ 33.)

On November 7, 2016, Leiser was seen again in HSU for back and testicle pain, reporting that the naproxen was not working.  Dr. Hoffman reviewed Leiser's complaints; he concluded that three days of naproxen use was not an adequate period of time to deem the medication ineffective.  Therefore, Dr. Hoffman declined to change Leiser's medications at that time.

### 2.  Nurse Johnson's November 24, 2016, Treatment for Leiser's Acute Pain

On November 24, 2016, Thanksgiving Day, staff from Leiser's unit called Nurse Johnson in the HSU, requesting that she see Leiser for his reported back pain, and Johnson agreed.  At 4:15 p.m. that day, Leiser arrived in the HSU, having been pushed there in a

wheelchair by security staff, and Johnson observed that Leiser was in a relaxed, upright position in the wheelchair with his feet resting on the foot pedals.  Leiser claims, however, that he was not in a relaxed position and was in severe pain.  This is the first of several disputes between Johnson and Leiser about how this examination took place.

Johnson starting by asking Leiser questions, beginning by asking about his lower back pain, and Leiser responded that he could not walk, his back locked up, and it hurt.  Johnson also asked Leiser if his pain had just started, and whether he knew that the HSU closed at 5:00 p.m.  Johnson claims that Leiser raised his voice in response, reporting that the pain had been there since the day before at 5:00 p.m.  Johnson continued her questions, observing that Leiser was becoming "frustrated and agitated," that he was "clenching the wheelchair arms," "raising his voice," and providing short answers.  Johnson claims that Leiser "demanded" that she call the on-call doctor because of his nerve pain.  (Johnson Decl. (dkt. 37) ¶ 8; Ex. 1000 (dkt. 35-1) 23-24.)  Leiser claims he was not confrontational, and that his body language reflected his pain, not frustration.

Johnson then took Leiser's vital signs, which she noted were all within parameters that did not require notifying the on-call doctor.  Johnson further noted that:  Leiser was alert and oriented; his skin color, temperature and sensation in lower extremities was normal; he denied dizziness, headaches, and numbness; and he did not report changes in bowel or urine patterns. Leiser disputes Johnson's assessment, claiming that Johnson did not touch his lower extremities; that he told her it was "hard to pee"; and that Johnson did not report that Leiser had to be held up by an officer.  (Leiser Aff. (dkt. 46) ¶ 41; Leiser Ex. 17 (dkt. 46-17).) Johnson's notes did include a note that he reported that it was hard to pee.  (Ex. 1000 (dkt. 35-1) 23-24.)  Johnson also reported that Leiser described his pain as sharp, as a "12/10," while

4

sitting in his wheelchair, that his pain didn't fall below a 7 out of 10 on a good day, and that he could not find a comfortable position.

Johnson then assessed Leiser's range of motion of his back by asking him to lean forward; and she reported that Leiser leaned forward "very easily, with no grimacing or guarded movements." (Johnson Decl. (dkt. 37) ¶ 11; Ex. 1000 (dkt. 35-1) 23-24.) Johnson did note some tightness and increased pain, but she did not observe any deformities, swelling, or changes to his spine, hips, or lower back. She also noted that Leiser sat back without difficulty. Johnson did not believe that Leiser's reported level of pain reflected his actual pain, and she explained that to Leiser, telling him she believed his pain was muscular. According to Johnson, Leiser became angry, yelling "I can't walk!" and "This is nerve pain. Call the doctor to send me to the hospital. I can't walk!" (Johnson Decl. (dkt. 37) ¶ 12; Ex. 1000 (dkt. 35-1) 23-24.) Leiser disputes yelling at her.

Then, Johnson called Leiser's housing unit on speakerphone to ask about his activities during the day. Johnson was told that: Leiser had been down the stairs several times to the dayroom for meals and to use the restroom, he cooked in the dining room, and he was living on the second floor of the housing unit on a top bunk, based on his own request. Johnson claims that upon hearing this, Leiser got upset, stating "I live on the top tier, top bunk because it's too cold on the lower tier." (Johnson Decl. (dkt. 37) ¶ 13.) Leiser denies that this exchange with his housing unit staff took place, claiming that Johnson fabricated this entire exchange and that he's never had a top bunk. Leiser does not attest that he did not live on the second floor of the housing unit.

Next, Johnson decided to assess whether Leiser could stand and walk using an assistive device. Leiser was wheeled out into the hallway and Johnson asked him to get out of his

wheelchair independently.  Johnson claims that even though Leiser was yelling that he couldn't stand, the officers directed him to try, and he "quickly bent over, folded up the foot pedals of the wheelchair, and struggled to get to a partial standing position while still holding the arms of the wheelchair."  (Johnson Decl. (dkt. 37) ¶ 14; Ex. 1000 (dkt. 35-1) 23-24.)  Then, according to Johnson, Leiser shouted "I can't," and flopped back into the wheelchair.  Johnson says that she asked Leiser to stand a second time so she could fit him with a cane, and he agreed.  Johnson says that Leiser was able to get up a bit quicker this time, and that he allowed the cane to be measured.  Leiser again says that Johnson is lying about how this assessment of his mobility took place:  Leiser claims Johnson ordered him to stand up so she could measure the length of a cane, and that the correctional officer present had to grab him to stop him from falling.  (Leiser Aff. (dkt. 46) ¶ 47.)

Johnson then notified Leiser's housing unit that Leiser would be returning with a cane. Johnson also attempted to give Leiser a low tier and bunk restriction, but she says that Leiser refused to move to a lower tier because "it's too cold down there."  (Johnson Decl. (dkt. 37) ¶ 15; Ex. 1000 (dkt. 35-1) 23-24.)  Leiser claims she never offered him a lower tier.

Before Leiser left the HSU, Johnson again tried to explain her belief that the pain was muscular, and she says Leiser responded "I know all this shit.  I just want the pain to stop." (Johnson Decl. (dkt. 37) ¶ 16; Ex. 1000 (dkt. 35-1) 23-24.)  Johnson says she agreed that he had pain, but because of his prior back surgeries, he may always have some degree of pain. Leiser disputes that Johnson conceded he was in pain.

Johnson scheduled a follow-up nurse visit for the following day, noting, "call on-call if no improvement or worse" (Ex. 1000 (dkt. 35-1) 24), and she also requested that he be scheduled for an on-site provider within 30 days.  Johnson also called his housing unit and

administrative staff to let them know about that plan, as well as Leiser's demeanor.  Johnson decided not to call the on-call doctor because she did not believe his pain was as severe as he reported, pointing to the fact that he denied numbness, he had good feeling in his lower extremities, and he didn't report a problem with bowel or bladder function.  Rather, she believed that access to a cane, his medication (Tylenol), ice, and heat was an appropriate course of treating what she perceived to be back strain.

Johnson also believed that Leiser's pain was not emergent, given that he was living in a cell on the upper tier and was sleeping in an upper bunk on his own volition.  Johnson says she did not adjust his medications because she had no authority to do so.  Finally, Johnson attests that she did not refuse to treat Leiser because it was a holiday, and that she ended up staying past the end of her shift.  Again, Leiser disputes Johnson's assessment, claiming he's never had a top bunk, and that Johnson never offered him a lower tier.  Dr. Hoffman reviewed Leiser's medical records, opining that Johnson's care was appropriate and followed nursing protocols.

### 3.  Nurse Frisk's November 25, 2016, Treatment of Leiser's Report of Continued Pain

On November 25, 2016, Nurse Frisk saw Leiser for a follow-up visit.  Leiser reported that it hurt to lay down, stand, and walk for the previous two days, and that his pain was the same as the day before.  Frisk took several actions in response to his reports of continued pain. Frisk recommended that Leiser continue using his cane, have access to a wheelchair for distance, and have a low tier restriction.  Frisk contacted the on-call doctor, Dr. Buono, who ordered a TENS unit, ibuprofen, muscle rub, and a warm compress, as well as a follow-up with a doctor for the next week.  Frisk also scheduled a follow up with a registered nurse and doctor for November 30, 2016.  Dr. Hoffman signed off on Frisk's order on November 29, 2016,

when he returned to the institution.  Although Leiser claims he didn't receive the TENS unit for three days after this visit, and that he argued with Frisk about the efficacy of Tylenol, ibuprofen, and muscle rub, he does not deny that Frisk called the on-call doctor, submitted the order, and made the follow-up appointments.  Dr. Hoffman opines that Frisk's decisions that day were appropriate.

On November 26, 2016, Nurse Frisk made a note in Leiser's file that she had spoken with Sergeant Jansen, who had been working on Leiser's unit.  According to Frisk, it was not unusual for HSU staff to contact unit staff about a prisoner's condition, in particular about ongoing health issues.  Jansen reported that Leiser was walking around his unit with his cane throughout the day.

Frisk met with Leiser again on December 1, 2016, for Leiser's complaint of nerve pain. The parties dispute how Leiser got to HSU:  Frisk attests that Leiser walked there with a cane and Leiser claims that he arrived in the HSU in a wheelchair.  Upon examination, Frisk noted that Leiser was able to walk with a cane, which Leiser disputes, that he moved with less "moaning and groaning than the week before," that there was no noted swelling or redness in his lower back, and no increased pain with palpation.  (Frisk Decl. (dkt. 38) ¶ 10; Ex. 1000 (dkt. 35-1) 19-20.)  Frisk did note, however, that Leiser reported having problems getting out of bed, so she discussed ways Leiser could get out of bed easier.  Frisk also ordered a four-prong cane be sent to maintenance for adjustment so that Leiser could use that cane instead of the regular cane he had been using.  Finally, Frisk referred Leiser to Dr. Hoffman, and according to Leiser, Frisk pushed him in the wheelchair to Dr. Hoffman's office.

### 4. **Dr. Hoffman's Referral to a Neurosurgeon, for an MRI, and Short-term Tramadol Prescription**

Dr. Hoffman examined Leiser that day, concluding that while Leiser was in pain, it seemed to him to be a "little exaggerated." (Hoffman Decl. (dkt. 35) ¶ 15.) Even so, Dr. Hoffman believed that Leiser's pain could be a progression of disc disease at L4-L5. Therefore, Dr. Hoffman decided that Leiser should be sent to get an MRI of his lumbar spine and referred him to a neurosurgeon. (Ex. 1000 (dkt. 35-1) 16-20, 80.) Dr. Hoffman also ordered Leiser a prescription of tramadol, 50 mg, three times daily, for three weeks, reasoning that a short-term prescription was appropriate because Leiser's pain complaints seemed to worsen when he was examined. (Hoffman Decl. (dkt. 35) ¶ 16.) Dr. Hoffman explains that due to the opioid epidemic, physician use of narcotics to address non-narcotic pain has been scrutinized, since narcotics are both highly addictive and poor drugs for chronic use. As such, Hoffman's opinion is that the decision to prescribe narcotics should be a last resort, and only on a short-term basis. (*Id.*)

On December 8, 2016, a nurse examined Leiser in the HSU for complaints that the tramadol "barely takes the edge off," and that his upper leg pain was increasing. (Ex. 1000 (dkt. 35-1) 14-15.) The nurse consulted with Dr. Hoffman, who decided it would be appropriate to continue Leiser's current plan of care, since he was scheduled for an MRI and neurosurgery consultation. Dr. Hoffman believed it was unnecessary to change the plan until after reviewing Leiser's MRI results. (Hoffman Decl. (dkt. 35) ¶ 17.) Leiser does not directly dispute Dr. Hoffman's justification, but adds that Dr. Hoffman told him that he was hesitant to prescribe opioids because of all the drug addicts in prison. (Leiser Aff. (dkt. 46) ¶ 21.)

On December 19, 2016, Leiser underwent an MRI of the lumbar spine at Mile Bluff Medical Center. The MRI showed:

> At L4-L5, there is a severe stenosis of the thecal sac relating to a posterior disk and osteophyte complex, epidural lipomatosis, facet joint arthritis and scar tissue formation in the posterior epidural region. Additionally, there is a right posterior disk extrusion that severely encroaches upon the exiting right L4 nerve root at the posterior aspect of the L4 vertebral body and transiting right L5 nerve root in the right lateral recess.

(Ex. 1000 (dkt. 35-1) 78-79.)  On December 20, 2016, Leiser went to Gunderson Lutheran Medical Center for a neurosurgery consultation.  Dr. Jerry Davis determined that Leiser's adjacent segment degenerative disease causing spinal stenosis could be managed by an L4-L5 facetectomy and extension of his previous fusion into the L4-L5 level.  Still, Dr. Davis concluded that due to Leiser's severe obesity, surgery was unfeasible.  Accordingly, Dr. Davis recommended that Leiser achieve a body weight of 225-230 pounds.  Dr. Davis did not recommend any change in pain medication.  (Ex. 1000 (dkt. 35-1) 5-9, 13.)  Leiser points out that Dr. Davis noted that Leiser was on tramadol at the time, but the records from that visit do not mention Leiser's tramadol prescription.  (*Id.* at 6.)  Regardless, Dr. Davis did not specifically make a recommendation about tramadol.

Leiser's tramadol prescription ended around December 20, 2016, and Dr. Hoffman didn't renew it.  On December 27, 2016, Leiser went to the HSU for complaints of pain.  He complained in particular that HSU was not providing medication that helped his pain, that lying on his side worsened his pain, that ibuprofen and APAP didn't help, and that he wanted help losing weight so he could undergo surgery.  The nurse examining Leiser consulted with Dr. Hoffman, who declined to renew Leiser's tramadol prescription.  Dr. Hoffman reasoned that it had become clear that Leiser's pain was chronic, and since in his professional opinion narcotics are ill-suited for chronic pain, it would have been inappropriate to lengthen Leiser's tramadol prescription.  Leiser disagrees with Dr. Hoffman's opinion, claiming that Dr. Hoffman left him in extreme pain and with ineffective medications.

10

On December 30, 2016, Nurse Frisk informed Dr. Hoffman that unit staff had contacted the HSU to report that Leiser had walked to HSU that morning with his cane because he did not want to wait for his wheelchair pusher to bring him to the HSU. Frisk further reported that she was told that Leiser did not complain about pain, and he refused an offer to have someone push him in a wheelchair back to his unit. However, Leiser claims that he was pushed back to his unit in a wheelchair, but it is undisputed that Dr. Hoffman was told that Leiser had walked with a cane that day.

On January 3, 2017, Frisk examined Leiser for complaints about testicle, arm, neck, shoulder, back, and leg pain. Leiser reported, "I can't move, walk, sit, or lay for a long time." (Ex. 1000 (dkt. 35-1) 44-45.) Frisk informed Leiser that Dr. Hoffman would examine him the following week, and that Leiser agreed to try curacaine, a topical analgesic. Dr. Hoffman approved the curacaine order that day. Leiser's appointment did not proceed as scheduled. According to Dr. Hoffman, staffing issues and the number of patients required Leiser's appointment to be rescheduled.

### 5. Dr. Hoffman's Decision to Prescribe Tramadol on a Long-term Basis to Assist with Leiser's Weight Loss

Dr. Hoffman met with Leiser on January 20, 2017, to discuss pain control. Dr. Hoffman reiterated that surgery was not possible until Leiser lost weight, and Leiser responded that his pain was so severe that he couldn't move or exercise. Considering that report, Dr. Hoffman decided to prescribe 100 mg of tramadol twice per day as needed to assist Leiser in losing the weight necessary for him to undergo surgery. Dr. Hoffman also ordered monthly weight checks, noting that if Leiser was not losing weight, the tramadol would be discontinued. (Hoffman Decl. (dkt. 35) ¶ 26; Ex. 1000 (dkt. 35-1) 42-43.) Dr. Hoffman also ordered another

MRI of Leiser's cervical spine, another consultation with neurosurgery to consider surgery, and a follow-up in two and a half months, to consider requesting prior authorization for extending Leiser's tramadol prescription further.

Dr. Hoffman explains that the DOC requires authorization from a committee of medical providers before a prisoner may be allowed longer-term use of narcotics. Therefore, on January 30, 2017, Dr. Hoffman completed an Authorization for Chronic Opioid Use for Leiser, in which he requested approval for Leiser to be prescribed 100 mg of tramadol, twice per day as needed to assist Leiser in losing weight so he could undergo back surgery. On February 8, 2017, the committee approved that prescription for a period of six months.

On July 25, 2017, as that prescription was nearing its end, Dr. Hoffman completed another Authorization for Chronic Opioid Use, seeking renewal of the tramadol prescription. Dr. Hoffman noted specifically Leiser's success in losing weight. The committee approved the tramadol prescription for another six months, with the stipulation that Leiser had met the goal of continuing weight loss. Likewise, on February 1, 2018, Dr. Hoffman ordered a renewal of Leiser's tramadol prescription for one year, with weight checks every 1-2 months.

### C. Dr. Hoffman's Discontinuation of Tramadol and Leiser's Reports of Withdrawal

Dr. Hoffman's approach changed the next month. On March 8, 2018, Leiser was charged in Conduct Report 2971141 with disrespect, disruptive conduct, and disobeying orders. Although Leiser was not actually charged with misusing his medication, non-defendant correctional officer Kuecker suspected that Leiser had "cheeked" his medication, meaning that she believed he was concealing his medication in his mouth without swallowing it. (Ex. 1000 (dkt. 35-1) 41; Miller Decl. (dkt. 36) ¶ 5.) Kuecker alleged that Leiser opened his mouth so

Kuecker "could only see the top of his tongue," and Leiser refused to allow her to examine the rest of his mouth.  (Miller Decl. Ex. 1001 (dkt. 36-1) 3.)  Then Kuecker directed Leiser to sit on the bench for 15 minutes, at which point Leiser became argumentative and was taken to restrictive housing.

Thereafter, security staff notified Dr. Hoffman that Leiser had attempted to cheek his tramadol by not complying with a request to expose his oral cavity for thorough inspection by staff, and then Leiser became argumentative.  (Hoffman Decl. (dkt. 35) ¶ 30.)  Accordingly, Dr. Hoffman concluded that Leiser was misusing his tramadol, thereby hindering his treatment. Dr. Hoffman discontinued Leiser's tramadol at that time.  (*Id.* ¶ 31.)  Leiser disputes misusing his medication.  He also claims that Dr. Hoffman's sudden discontinuation of tramadol ran contrary to recommendations that tramadol be tapered off to avoid withdrawal symptoms.  (*See* Leiser Ex. 4 (dkt. 46-4).)

The next day (March 9, 2018), defendant Nurse Krahenbuhl met with Leiser in restrictive housing because Leiser had been complaining about withdrawal symptoms from the cessation of tramadol.  Leiser specifically complained that he had chills, couldn't eat, and was sweating.  Krahenbuhl noted that Leiser was breathing heavily and shaking, but alert and oriented.  Leiser further described a sharp, shooting, stabbing pain in his chest, which Krahenbuhl noted he rated as an 8 out of 10.  (Ex. 1000 (dkt. 35-1) 39-40; Krahenbuhl Decl. (dkt.39) ¶ 5.)  Leiser disputes what Krahenbuhl wrote, insisting that he told Krahenbuhl that his pain level was a 12 out of 10, and that he attributed his pain to the discontinued tramadol. (Leiser Aff. (dkt. 46) ¶ 63.)

Regardless, Krahenbuhl attests that she did not perceive his chest pains to be a cardiac issue.  For one, Leiser's focus during their interaction was that he wanted more tramadol; he

13

was not focused on his chest pain.   Rather, Krahenbuhl states that she perceived Leiser's reported chest pain as symptoms of his agitation, irritation, high level anxiety, and yelling because Dr. Hoffman discontinued his tramadol.   (Krahenbuhl Decl. (dkt. 39) ¶ 6.) Krahenbuhl further believed that Leiser's chest pains were not cardiac related because about a week before, on March 1, 2018, Leiser had been seen for chest pains at Gunderson Cardiology. During that appointment, Dr. Ward Brown noted that Leiser's tests results showed "normal myocardial perfusion with preserved left ventricular systolic function" and "no gross valvular abnormality." (Ex. 1000 (dkt. 35-1) 71; Krahenbuhl Decl. (dkt. 39) ¶¶ 7-8.)

Krahenbuhl then spoke with the on-call doctor, Dr. Fuller, on the phone.   Krahenbuhl reported that Leiser's tramadol had been discontinued for "cheeking," and reported her assessment about his symptoms.   It is unclear from the record exactly what Krahenbuhl reported to Dr. Fuller about Leiser's chest pains; it appears the focus of the conversation was only on the discontinued tramadol.   Dr. Fuller ordered 500 mg of naproxen twice a day, and an increase in Tylenol to 1000 mg three times per day.   According to Krahenbuhl, when Krahenbuhl informed Leiser that Dr. Fuller declined to reorder tramadol for him, and went with naproxen and Tylenol instead, Leiser became extremely upset and agitated, stating that he was going to sue them for not giving him tramadol because that was the only medication that would work.   (Krahenbuhl Decl. (dkt. 39) ¶ 10.)

Leiser disputes that this exchange with Krahenbuhl occurred.   He also claims that Krahenbuhl ignored Dr. Hoffman's March 1, 2018, order that Leiser undergo a cardiac catheterization, which should have alerted her to a cardiac problem when Leiser reported chest pains.   (Leiser Aff. (dkt. 46) ¶ 93.)   Krahenbuhl has not attested to whether she noticed the March 1, 2018, order.

Dr. Hoffman subsequently reviewed Krahenbuhl's assessment.   In his professional opinion, Leiser received appropriate care on March 9, 2018, since the description of his chest pain was not typical of the description for angina or a heart attack.   In any event, Dr. Hoffman opines that Krahenbuhl acted appropriately by contacting Dr. Fuller, who ordered the naproxen and Tylenol to address Leiser's discomfort.   Dr. Hoffman further notes that common symptoms of tramadol withdrawal include runny nose, sweating, restlessness, trouble sleeping, agitation, vomiting and diarrhea.   Dr. Hoffman acknowledges that Leiser may have been suffering from withdrawal symptoms, but the symptoms are not life threatening, especially because Leiser's tramadol dosage was not considered a high dose, meaning that his withdrawal symptoms would not have been severe.  (Hoffman Decl. (dkt. 35) ¶¶ 34-35.)

On March 11, 2018, Leiser submitted a Health Services Request (HSR) complaining about his tramadol being discontinued and reporting that he was suffering from withdrawal symptoms that included chest pain.  Leiser directed the HSR to defendant Barker, the HSU manager.  The HSR was received in the HSU on March 13, 2018.

Barker attests that even though the HSR was directed to her, HSU staff do not route it to her directly pursuant to policy.  Rather, when an inmate submits an HSR to the HSU, a registered nurse triages the HSR and responds within 24 hours.  (Barker Decl. (dkt. 40) ¶ 8.) The registered nurse uses his or her nursing training and judgment when triaging the HSR and prioritizing appointments and inmate needs.  (*Id.*)[4]  Barker explains that all HSR's are triaged in this manner, regardless of the intended recipient, to serve patient care and safety, since an

---

[4] Leiser disputes this policy, pointing out that HSU managers are the staff that must be contacted when a prisoner wants to informally resolve a grievance about his medical care before filing an inmate complaint.  *See* Wis. Admin. Code. § DOC 310.  However, Leiser is referring to the process by which an inmate pursues an inmate complaint, *not* the policy HSU staff follow in receiving requests for medical attention set forth in HSR's.

HSR directed to a specific staff member may be more emergent and thus require the immediate attention of the triaging nurse.

Pursuant to that policy, Nurse Gohde triaged the HSR and responded "Dr. Hoffman has discontinued your medication.  Medication will not be restarted at this time!"  (Ex. 1000 (dkt. 35-1) 81-82; Barker Decl. (dkt. 40) ¶ 11.)  Barker does not recall receiving or seeing Leiser's HSR, since Gohde triaged it.

### D. Leiser's Cardiac Catheterization, Angioplasty and Missed Doses of Clopidogrel

As noted, on March 1, 2018, Leiser went to Gundersen Lutheran Medical Center due to complaints of chest pain.  Dr. Ward examined him, and Leiser reported having intermittent episodes of chest pain for the past 4-5 months, during periods of both rest and exertion.  Leiser described the pain as "tightening in the chest" that radiated to his left arm, and he said that the pain was accompanied by sweating and shortness of breath, lasted between 5 and 15 minutes, but then would just go away.

Dr. Brown discussed Leiser's previous sestamibi study,[5] which showed normal myocardial perfusion with preserved left ventricular systolic function, as well as Leiser's transthoracic echo, which showed well-preserved left ventricular systolic function and no gross valvular abnormality.  According to Dr. Hoffman, this means that blood flow into all segments of the heart muscle were normal and that Leiser had a "vigorously pumping heart muscle and that all valves were opening and closing appropriately."  (Hoffman Decl. (dkt. #35) ¶ 37; Ex.

---

[5]  A sestamibi exercise stress test is a diagnostic study that can help determine if there is adequate blood flow to the heart at rest, as compared with activity.  *See* https://www.webmd.com/heart-disease/heart-failure/qa/what-is-the-definition-of-sestamibi-exercise-stress-test (last visited Aug. 18, 2020).

1000 (dkt. 35-1) 71-75.)  Dr. Brown told Leiser that his pain was challenging, telling Leiser that they could either continue to observe his condition or Leiser could undergo a cardiac catheterization.  (Ex. 1000 (dkt. 35-1) 71-75; Hoffman Decl. (dkt. 35) ¶ 38.)  Dr. Brown recommended that Dr. Hoffman consider the cardiac catheterization, continue Leiser with his current medications and cardiac risk factor reduction efforts, and follow up with the office as needed.  Dr. Hoffman therefore wrote an order for Leiser to undergo the cardiac catheterization with Dr. Brown.

On April 20, 2018, Leiser underwent the cardiac catheterization with Dr. Brown, which revealed 90% narrowing in two different vessels.  (Ex. 1000 (dkt. 35-1) 58-70.)  Therefore, the procedure was immediately followed by an angioplasty and stenting of those two narrowed areas of his heart.  Leiser tolerated the procedure well and had no questions or complaints regarding discharge procedures.  He was discharged the same day with orders for a follow-up with Dr. Hoffman in 1-2 weeks, a prescription for Plavix (clopidogrel), ASA, Lopressor, high intensity statin therapy, atorvastatin and switching diltiazem to amlodipine.[6]  Clopidogrel and aspirin are medications to help the blood flow until the body heals the inside surface of the arteries.

It is not clear from the record what happened to the orders for those medications, but it is undisputed that Leiser did not receive them starting April 20, as prescribed.  According to Krahenbuhl, who was working in the HSU that day, this order was not flagged as "STAT," so she believes it was likely sent to the regular pile of orders for nurses to transcribe during their

---

[6] Lopressor stabilizes the heart rhythm to prevent dangerous, unstable rhythms for the period after the procedure.  Atorvastain is a potent statin to lower cholesterol and present re-accumulation of cholesterol in the artery wall.  Amlodipine appears to have been prescribed to lower the risk of angina from coronary artery spasm.

normal duties. However, Leiser says that when he returned to NLCI on the afternoon of April 20, 2018, he went to the HSU and talked to Krahenbuhl. Leiser claims that he asked Krahenbuhl about his medications he was supposed to receive when he returned to NLCI, and she responded that she didn't know anything about it and didn't check his medical file. (Leiser Aff. (dkt. 46) ¶¶ 75-77.)

Krahenbuhl does not remember these events, but she acknowledges that she added a note to Dr. Hoffman's prescriber orders at 7:41 p.m. on April 20, 2018. (Krahenbuhl Decl. (dkt. 39) ¶ 13.) According to Krahenbuhl, because the order was not flagged "STAT," she likely sent it "into the regular pile or orders for nurses to transcribe during their normal duties after sick call and nursing visits were done." (*Id.* ¶ 12.) She further believes that because clopidogrel is not normally stocked in NLCI's pharmacy, this medication was likely ordered from a pharmacy from Waupun Correctional Institution. (*Id.* ¶ 14.) Krahenbuhl did not work again until April 21 or 22, 2018, and she says she does not know when the clopidogrel order was placed.

On April 23, 2018, Dr. Hoffman met with Leiser as a follow-up to his cardiac catheterization with angioplasty and stenting. Leiser reported pain with the exertion of walking five laps, and that he had received his amlodipine, but not his clopidogrel. Dr. Hoffman ordered that he get his clopidogrel that day and atorvastatin 40 mg, and he directed that Leiser see him again that week for chest pain.[7] Leiser received the clopidogrel that day.

On April 26, 2018, Dr. Hoffman met with Leiser for his follow-up appointment. Leisure reported continued chest tightness with walking, but less fatigue. Dr. Hoffman discontinued

---

[7] Krahenbuhl believes that when Dr. Hoffman placed the order on April 23, the nurses would have either pulled the order from the shelf if the order from April 20 had arrived, or placed the order locally.

Leiser's prescriptions for omeprazole and naproxen because those medications might have adverse interactions with the clopidogrel Leiser started taking on the 23rd. Leiser also raised a concern regarding his severe GERD and the discontinuation of omeprazole, so Dr. Hoffman prescribed him pantoprazole and ordered a follow-up in one week.

On April 30, 2018, Dr. Hoffman met with Leiser for his hypertension, and Leiser reported taking his medications regularly. Still Leiser, again complained of chest pain after exertion and some shortness of breath. Dr. Hoffman recommended that Leiser keep up with his walking, and Dr. Hoffman's plan of care for that day included increasing Leiser's amlodipine to 10 mg daily for better blood pressure control, increasing his aspirin to 325 mg daily, starting Leiser on metoprolol 12.5 mg twice daily, and scheduling another check in in three days. Dr. Hoffman also decided to contact Dr. Brown for a follow-up plan.

On May 3, 2018, Dr. Hoffman saw Leiser for the follow-up to the angioplasty. Dr. Hoffman noted that Leiser was slowly improving and that Leiser showed greater endurance, but that Leiser continued to show symptoms of angina with exertion. Therefore, that afternoon Dr. Hoffman spoke with Dr. Brown. In Dr. Brown's view, the delay in providing Leiser the clopidogrel warranted a second catheterization to investigate Leiser's reports of exertion-related angina. So Leiser underwent a second cardiac catheterization the next day, May 4, 2018.

That second cardiac catheterization showed that his arteries were wide open, and the stents were functioning well. In Dr. Hoffman's view, the delay between the angioplasty and when Leiser received clopidogrel was inconsequential, since clopidogrel prevents arteries from

closing.  Thus, in his opinion, the harm Leiser suffered was undergoing the procedure itself, which was not harmful but a treatment to ensure continued health.[8]

On May 10, 2018, Dr. Hoffman saw Leiser for a follow-up to his chest pain and repeat cardiac catheterization.  Leiser reported continued chest pain, and that because he believed his thyroid hormone--L-thyroxine--was associated with his chest pain, he stopped taking that medication.  Dr. Hoffman was not convinced that the thyroid hormone was related to his angina, but saw no harm in allowing Leiser to stop taking the medication because changes in thyroid hormone take a long time to take effect.  Leiser claims that when he restarted the thyroid hormone a few months later at a lower dose, his chest pains did not return.  He claims that Dr. Hoffman overdosed him by accident.


OPINION

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted).  During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation

---

[8] Leiser disputes Dr. Hoffman's assertion, claiming that Dr. Brown told him there was a danger associated with a second procedure.  However, the evidence Leiser cites (*see* Leiser Aff. (dkt. 46) ¶ 94), does not include a statement that Dr. Brown told him that the second procedure was dangerous.

or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

## II.     Medical Care Deliberate Indifference

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements:  (1) an objectively serious medical condition and (2) a state official who was deliberately (that is, subjectively) indifferent.  *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  For purposes of summary judgment, defendants do not dispute that Leiser's persistent back pain, reports of chest pain, and heart condition amounted to serious medical needs; what they contend is that no reasonable trier of fact could find that any of the defendant's handling of Leiser's conditions constituted deliberate indifference.

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Deliberate indifference constitutes more than negligent acts, or even grossly negligent acts, although it requires something less than purposeful acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id.*at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice

21

is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).  In *Petties,* the Seventh Circuit outlined categories of conduct that could support a finding of deliberate indifference in a medical setting:  when a doctor refuses to take instruction from a specialist; when a doctor fails to follow an accepted protocol; when a medical provider persists in a course of treatment known to be ineffective; when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or when the treatment involved an inexplicable delay lacking a penological interest.  *Petties*, 836 F.3d at 729-31.  The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs."  *Id.* at 728; *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).  For reasons explained below, no reasonable jury could find

that any of the defendant's responses to Leiser's need for treatment and medication to address his varying complaints of pain amounted to deliberate indifference.[9]

### A.   Dr. Hoffman's 2016 Tramadol Prescription and 2018 Discontinuation of Tramadol

Leiser challenges Dr. Hoffman's 2016 and 2018 prescription decisions.  As for Dr. Hoffman's decisions at the end of 2016, Leiser takes issue with Dr. Hoffman's refusal to prescribe him tramadol until December 1, 2016, pointing to his complaints of severe pain from the beginning of November through that day, when he prescribed him a three-week supply of tramadol.  Leiser accuses Dr. Hoffman of persisting in a course of treatment he knew to be ineffective, which, as noted above, may violate the Eighth Amendment.  *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016).  Yet the record does not support a finding that Dr. Hoffman failed to exercise reasonable medical judgment in first seeing whether Leiser would respond well to naproxen, and then starting him on tramadol on just a short-term basis.

To start, in Dr. Hoffman's professional opinion, it would have been harmful for Leiser to immediately start taking narcotics, since Dr. Hoffman ascribes to the well-established consensus that narcotic medications are a poor choice to treat chronic pain.  No reasonable fact-finder could conclude that Dr. Hoffman's hesitant attitude towards narcotics was not grounded in accepted medical judgment. *Burton*, 805 F.3d at 785 (affirming finding that doctor who declined to prescribe narcotics to detainee was acting reasonably, not in a "substantial departure from accepted professional judgment, practice, or standards") (quoting *Jackson v.*

---

[9]   Defendants also raise qualified immunity as a defense, but I need not reach that question because Leiser's claims fail on the merits.

*Kotter*, 541 F.3d 668, 697 (7th Cir. 2008)); *see also Snipes v. DeTella*, 95 F.3d 586, 591-92 (7th Cir. 1996) ("Using [pain killers] entails risks that doctors must consider in light of the benefits. . . .  Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations.").

Leiser challenges this justification, citing his evidence that Dr. Hoffman told him that he was reluctant to prescribe him tramadol because so many prisoners were addicted to narcotics.  Even assuming that Dr. Hoffman said this, it does nothing to impeach the sincerity of his opinion that the long-term use of narcotics was an inappropriate way to treat chronic pain.  The two opinions are not mutually exclusive; in fact, they can comfortably coexist.  The only reasonable inference to be drawn from this statement (assuming that Dr. Hoffman made it) is that Dr. Hoffman was hesitant to prescribe narcotics out of concern that they were being prescribed too widely and were being abused by prisoners, which is consistent with Dr. Hoffman's philosophy about long-term narcotic use and entirely consistent with the exercise of reasonable medical judgment.

Still, Leiser claims that because he told Dr. Hoffman on November 4 that naproxen had not worked for him in the past, Dr. Hoffman erred by persisting in a treatment he knew would not alleviate Leiser's pain.  However, to establish that a doctor persisted in an ineffective course of treatment, a plaintiff needs to come forward with evidence that the physician "'doggedly persist[ed] in a course of treatment known to be ineffective'" to establish an Eighth Amendment violation.  *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quoting *Greeno*, 414 F.3d at 655).  Even assuming that Leiser reported that naproxen had not worked for him in the past, Leiser has not submitted any evidence that would have given his report any objective weight with Dr. Hoffman, for instance, when he had taken naproxen previously, for

what type of pain, in what dosage(s), and for how long. Nor does Leiser allege that Dr. Hoffman had been the physician that prescribed him naproxen previously. It does not follow from this that Dr. Hoffman's decision to give naproxen a try and see for himself whether it worked for Leiser evinced an obdurate refusal to acknowledge a known fact. On this record, Leiser's claim essentially amounts to his disagreement with Dr. Hoffman about the most appropriate pain medication to prescribe. All patients are entitled to input on their course of treatment, but the Eighth Amendment does not entitle a prisoner to the treatment of his choice, *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles*, 771 F.3d at 409 (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)).

The result is the same with respect to Dr. Hoffman's refusal to change the prescription on November 7. Indeed, Dr. Hoffman's position is that he wanted to see how Leiser would do on this medication, and no evidence suggests that Dr. Hoffman *knew* that naproxen would not be effective to treat Leiser's more acute pain, just three days after Leiser started the prescription. Rather, Dr. Hoffman denied Leiser's request for a different medication because he believed that three days was an insufficient amount of time to deem naproxen ineffective. Given that less than a month later Dr. Hoffman *did* change course based on Leiser's continued reports of pain and difficulty moving, the evidence demonstrates that Dr. Hoffman did *not* stubbornly refuse to consider a different course of treatment. *Cf. Goodloe*, 947 F.3d at 1031 ("when a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong") (citing *Greeno*, 414 F.3d at 655).

Indeed, on December 1, 2016, when Nurse Frisk called Leiser's increased pain complaints and problems with mobility to Dr. Hoffman's attention, Dr. Hoffman was persuaded that Leiser's pain required additional interventions, including an MRI, referral to a neurosurgeon and a three-week tramadol prescription to address that acute period of severe pain. Leiser takes issue with the short-term prescription, but, again, Dr. Hoffman explains he prescribed it for just three weeks because he was not persuaded long-term use was appropriate for Leiser at that point.

Although Leiser complained a week later, on December 8, 2016, that tramadol "barely takes the edge off," no evidence of record suggests that Dr. Hoffman's failure to do more at that point -- before he had the MRI and neurosurgery consult -- supports a reasonable inference of deliberate indifference. Leiser had just started taking tramadol, and Dr. Hoffman attests that he did not believe it was appropriate to increase Leiser's dose at that point, since his MRI and consult were pending. Although Leiser insists that Dr. Hoffman again left him in pain, the record still suggests that throughout this time, Leiser continued to have access to his cane, the TENS unit, NSAIDs, ice, and a warm compress. Furthermore, no evidence of record suggests that Dr. Hoffman's justification was not genuine. *See Zaya v. Sood*, 836 F.3d 800 (7th Cir. 2016) ("By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment.").

Then, after Leiser's MRI confirmed that Leiser suffered from a degenerative disease causing spinal stenosis, Dr. Hoffman concluded that because his pain was, indeed, chronic, it was inappropriate to put Leiser back on tramadol. At this juncture, Dr. Hoffman's decision was based on his view that tramadol would not be an appropriate long-term solution for Leiser's

pain.  Leiser disagrees with this decision, and he claims he told Dr. Hoffman on December 27 that he needed the tramadol to lose weight.  However, even if Leiser told Hoffman he needed the tramadol for weight loss, it is undisputed that Dr. Hoffman was not persuaded that was a necessary step at that point, since narcotics are a last resort.  Just a few days later, on December 30, Dr. Hoffman learned that Leiser had been walking around his unit staff with his cane without complaints of pain, which informed his January 3 decision to order curacaine for Leiser when he reported that he couldn't move.  Again, although Leiser disagrees with Dr. Hoffman's more conservative approach to his back pain during this time frame, it is undisputed that Dr. Hoffman had reason to believe not only that Leiser was able to move without pain, but also that tramadol was not a good long-term solution.  Again, Leiser was not left without any tools for pain relief: he still had access to his cane, NSAIDs, his TENS unit, ice, and warm compress during this time frame.  As such, Dr. Hoffman did not demonstrate deliberate indifference to Leiser's ongoing pain; he made treatment choices based on his consideration of the relevant circumstances, choices with which Leiser disagreed at the time and to this day.

Dr. Hoffman's January 20, 2017, decision to prescribe a longer-term tramadol dose for Leiser was a consistent next step to take based on the circumstances at that time: Leiser reported that he could not move or exercise, so Dr. Hoffman decided that tramadol might assist Leiser's weight loss efforts, which would qualify Leiser for spinal surgery.  Dr. Hoffman's three subsequent renewals of the requests for the six-month tramadol prescriptions hinged on Leiser's ongoing commitment to exercise, to lose weight and to undergo the surgery that Dr. Davis had recommended.  Thus, Dr. Hoffman's decision does not support the inference that he had failed to exercise acceptable medical judgment when he had declined to prescribe tramadol for Leiser

just weeks earlier.  It was a rational response to changed circumstances intended to help Leiser qualify for pain-reducing surgery.

It follows from this that Dr. Hoffman's discontinuation of Leiser's tramadol on March 8, 2018, was a treatment decision consistent with Dr. Hoffman's earlier decisions regarding when and why Leiser should receive tramadol.  As noted above, Dr. Hoffman had no intention of continuing Leiser on tramadol indefinitely because this was not an effective long-term pain management strategy.  But Dr. Hoffman acquiesced to Leiser's use of tramadol as a component of Leiser's weight reduction program so that he could qualify for back surgery.  On March 8, 2018, however, Dr. Hoffman learned that staff asked to examine Leiser's entire mouth, and he refused, and then became disruptive when staff directed him to sit on a bench for 15 minutes.  Although Leiser was not charged with, or punished for, misusing or "cheeking" his medication, it is undisputed that staff reported this matter to Dr. Hoffman and that this report led Dr. Hoffman to conclude that Leiser had misused his tramadol.  Because Dr. Hoffman already had concluded that Leiser's continued use of tramadol was justified only to help Leiser lose weight, and because Leiser's behavior led Dr. Hoffman to conclude that Leiser was not taking his weight loss goal seriously and in fact might be misusing the tramadol, then his decision to cut off Leiser's tramadol supply was a rational exercise of medical judgment.  Put the other way, it cannot be viewed as a failure to exercise sound medical judgment.  *See Lockett v. Bonson*, 937 F.3d 1016, 1024-25 (7th Cir. 2018)(nurse practitioner clearly exercised medical judgment by substituting Tylenol 3 for oxycodone out of concern for risks associated with substance abuse in prison).

Leiser also takes issue with Dr. Hoffman's failure to wean him off of tramadol, but Dr. Hoffman opines that "Leiser's dose of 100mg twice daily is not considered a 'high' dose, and

therefore should not have resulted in severe withdrawal symptoms." (Hoffman Decl. (dkt. 35) ¶ 35.) Although Leiser claims that Dr. Hoffman's conclusion ignored the recommendations from the FDA, Leiser has not submitted any evidence that calls into question Dr. Hoffman's judgment call related to Leiser's particular dose of tramadol, much less evidence that suggests that *any* dose of tramadol cannot be immediately discontinued. Even assuming, *arguendo*, that Dr. Hoffman's conclusion about the possibility of withdrawal symptoms was wrong, this would at most constitute negligence, given his undisputed explanation for this sudden discontinuation and his observation that Leiser's dosage was not high. This was not the type of conscious disregard for Leiser's health or safety that would support an inference of deliberate indifference.

In sum, when viewing the totality of Dr. Hoffman's care for Leiser, no reasonable fact-finder could conclude that Dr. Hoffman failed to exercise medical judgment. The record before the court demonstrates that Dr. Hoffman did properly exercise medical judgment: he initially was hesitant to prescribe tramadol out of a legitimate concern that it would be ineffective for Leiser's pain management. Then he agreed to prescribe tramadol for Leiser, beginning with a short-term prescription before acquiescing to to a longer-term prescription once he was persuaded Leiser needed it for weight loss. Dr. Hoffman only discontinued Leiser's tramadol when he was provided with reason to believe that Leiser was misusing it. These steps reflect a deliberate approach to Leiser's medication regime, not a decision-making process so afield from acceptable standards to support an inference of deliberate indifference. Accordingly, Dr. Hoffman is entitled to judgment in his favor.

**B.      Nurse Johnson's Response to Leiser's Pain on November 24, 2016**

During Johnson's Thanksgiving-day examination of Leiser, Johnson did not ignore Leiser's report that he believed he was having nerve pain; instead, she disagreed with his assessment of it, based on her professional opinion about how he moved and how he presented. Johnson provided Leiser with a cane, ice, and Tylenol, and sent him back to his housing unit.

Leiser claims this response to his symptoms supports an inference of deliberate indifference because Johnson failed to call the on-call doctor.  This interaction between Leiser and Johnson is rife with factual disputes, but even when I accept Leiser's version of the examination as true, Johnson's handling of his symptoms does not support his claim of deliberate indifference.

First, it is undisputed that all of Leiser's vital signs were within normal ranges that day, so his condition did not present a medical emergency.  Next, it is undisputed that Johnson could not have prescribed Leiser tramadol or any new prescriptions that day.  So, the pivotal question is whether Johnson's judgment that Leiser's pain was muscle and not nerve-related, and her decision not to call the on-call doctor, suggest deliberate indifference.

Leiser agrees with Johnson's notes that he had reported his pain as a 12 out of 10, that he was unable to find a comfortable position and that she noted tightness and increased pain with movement.  Leiser also claims that he had to be wheeled to the HSU that afternoon because he was unable to walk.  Leiser disputes Johnson's notes that he was able to move easily; it is undisputed that Leiser was experiencing tightness and increased pain when he leaned forward.  It is also undisputed that Johnson disagreed with Leiser about the source of pain, telling Leiser that she believed it was muscular.  Although Leiser disputes Johnson's claims that he yelled at her, he does not dispute that they disagreed about the source of the pain.  Leiser

also disputes Johnson's notes and representations about how she tested whether he could walk: he claims that she forced him to stand up so she could measure a cane for him.

For summary judgment purposes, I accept Leiser's version of events as correct: Leiser had difficulty moving because he was experiencing intense pain.  That being so, Johnson nonetheless had reason to believe that Leiser still had the ability to move around on his own. Specifically, Leiser has not submitted evidence disputing Johnson's assertion that she spoke with officials working in Leiser's housing unit, who reported that Leiser had been able to use the stairs to go to meals and use the restroom; that Leiser had been cooking in the dining room; and that he was living on the second floor of the housing unit.[10]  Although Johnson also noted that Leiser was using a top bunk, Leiser asserts that he never has had a top bunk, so I will accept Leiser's assertion.  Johnson attests that, based on how Leiser presented to her and what she learned from Leiser's unit staff, Johnson did not believe that it was necessary for her to alert the on-call doctor to address Leiser's symptoms at that time.  Instead, she concluded that it was appropriate to issue Leiser Tylenol, ice, heat, a cane along with a note that the on-call doctor should be notified if his condition did not improve or if it worsened.

Leiser insists that Johnson's failure to send her to the hospital or call a doctor constitutes deliberate indifference.  He points to Johnson's comment that she was going home for her Thanksgiving dinner as proof that she acted inappropriately.  Not so.  If Johnson had made this comment while refusing to examine Leiser at all and shooing him away from the HSU empty-handed, then her actions might edge closer to deliberate indifference.  But on this

---

[10]  Leiser disputes that Johnson spoke with the officers that observed him earlier in the day because a new shift would have been working by the time Johnson called his unit.  However, Leiser does not dispute that Leiser's unit staff reported that Leiser had been engaging in those activities that day.

record--even when accepting as true Leiser's statements about how he presented--it would be unreasonable to infer that Johnson knew that she should alert the on-call doctor or take further action but chose not to do so.  Leiser's version of their interaction that day demonstrates that he disagreed with Johnson's assessment of his pain and how to respond to it; it does not demonstrate that Johnson failed to exercise medical judgment.  This disagreement does not amount to deliberate indifference.

The fact that the next day the on-call doctor, Dr. Buono, recommended various pieces of equipment to assist in pain relief does not permit the inference that Johnson had been deliberately indifferent in failing to call the on-call doctor on November 24.  Indeed, Johnson's note anticipated that it might be appropriate to contact the on-call doctor if the measures taken on November 25 didn't sufficiently ameliorate Leiser's complaints of pain.  In any event, even if Johnson could have taken steps to provide Leiser with those additional items on November 24, Leiser has not shown that her decision that his pain was muscular and non-urgent was clearly wrong.  *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) ("[A] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances.") (quoting *Sain*, 512 F.3d at 894-95 ).  The only evidence of record suggesting that Leiser's pain was nerve and not muscle-related appears to be *his* insistence that it was so.  A patient's reported symptoms are relevant to adequately assessing the appropriate treatment, *see Goodloe*, 947 F.3d at 1032 ("Patients are often the best source of information about their medical condition."), but Johnson had objective reasons to disagree with him, based on her observations of how he moved and what his unit staff reported about his mobility earlier that day.  On this record, no reasonable fact finder could conclude that Johnson either disregarded Leiser's symptoms or responded so inappropriately as to permit

an inference that she failed to exercise professional judgment that day.  Accordingly, Johnson is entitled to judgment in her favor as well.

### C.      Nurse Frisk's Response to Leiser's Complaints on November 25, 2016

Like Johnson, Frisk treated Leiser but she just did not provide the degree of care that Leiser felt was appropriate.  Frisk was even more proactive than Johnson: she not only provided Leiser with a low tier restriction, a cane and a wheelchair restriction for distances, she also called Dr. Buono, who in turn ordered a TENS unit, ibuprofen, muscle rub, a warm compress and a follow-up.  Frisk scheduled the follow-up and ordered the items requested.  Frist was entitled to defer to Dr. Buono's treatment decision that day, so long as she did not ignore any obvious risks associated with that decision.  *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012) (nurse is entitled to rely on a doctor's instruction unless it's obvious that the doctor's advice will harm the prisoner); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (a nurse's "deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient").  Leiser doesn't point to any reason why Frisk should have questioned Dr. Buono's orders that day.

Instead, Leiser makes much of the fact that he did not actually obtain the TENS unit for another three days, implying that Frisk somehow is responsible for this delay without actually saying so.  Leiser has not submitted any evidence suggesting that Frisk did not actually order the TENS unit, or that she even was aware that Leiser had not received it that day.  There is no evidentiary basis to hold Frisk accountable for that delay.  Accordingly, no reasonable fact-finder could conclude that Frisk responded to Leiser's complaints of pain on November 25, 2016, with deliberate indifference, and she is entitled to judgment in her favor.

33

**D.      Nurse Krahenbuhl's handling of chest pain complaints on March 9, 2018**

Leiser argues that Krahenbuhl's handling of his reports of chest pain on March 9, 2018, supports an inference of deliberate indifference.  Leiser points to the fact that, as of March 9, Dr. Hoffman had ordered Leiser's cardiac catheterization, at Dr. Brown's recommendation, an order which should have cause Krahenbuhl to treat his reported chest pains as an emergency. However, given the nature of Leiser's complaints that day, it would be unreasonable to infer that Krahenbuhl consciously disregarded the possibility that Leiser was having a cardiac issue.

It is true that Dr. Hoffman had placed the order March 1, 2018.  However, it is unclear from the evidence of record whether Krahenbuhl would have been aware of that order that day. Regardless whether Krahenbuhl did know or should have been aware of the cardiac catheterization order, it is not apparent that Krahenbuhl failed to exercise her professional judgment that day when she perceived Leiser to be seeking a renewal of his tramadol prescription, and not being focused on his chest pains.  First, even assuming, *arguendo*, that Krahenbuhl knew about Leiser's scheduled cardiac catheterization, that order did not clearly indicate that Leiser's chest pains presented an urgent problem.  Rather, as of on March 1, 2018, Dr. Brown had opined that Leiser's tests were normal, and he did not recommend that Leiser's catheterization be performed on an urgent basis.

More importantly, Leiser's focus during his interaction with Krahenbuhl on March 9 was related to tramadol, not any concern about a cardiac event.  Krahenbuhl's notes show that Leiser was breathing heavily and shaking, and that the pain in his chest was a "sharp, shooting, stabbing pain."  (Ex. 1000 (dkt. 35-1) 39-40.)  Although Krahenbuhl recorded Leiser's ranking of his pain level and an 8/10, and Leiser claims he told her it was a 12/10, there is no question that Krahenbuhl acknowledged that Leiser was having severe  chest pain.  Yet Leiser does not

dispute that the main concern he communicated to Krahenbuhl that day was that he needed to take more tramadol.  That was how Krahenbuhl perceived Leiser's symptoms, which framed her communication with the on-call doctor, Dr. Fuller.  Further, Dr. Hoffman opines that the chest pains described by Leiser were not typical of angina or a heart attack, and there is no evidence that Leiser suffered a cardiac event that day.  Put simply, there is no reason to conclude that Leiser's symptoms were more serious than the discomfort of withdrawal.  Since Krahenbuhl took steps to address that pain by contacting Dr. Fuller, who in turn increased Leiser's Tylenol and naproxen, it would be unreasonable to infer that she consciously disregarded a risk to his health.

Leiser disputes Dr. Hoffman's opinion, but he has not submitted any evidence that any additional medical treatment actually was necessary to address his pain that day.  Leiser contends that Krahenbuhl *should* have known that he *might* have a heart condition and therefore was constitutionally obliged to take more aggressive action that day to address his chest pain. The only additional step that Krahenbuhl could have taken would have been to provide Dr. Fuller with more information about Leiser's scheduled cardiac catheterization over the phone. As noted above, it is not clear that Krahenbuhl even knew about Leiser's imminent catheterization.  Leiser he does not claim to have even brought up his scheduled cardiac catheterization with Krahenbuhl.  But even assuming that she had some knowledge of this imminent procedure, Leiser does not appear to dispute that his focus during his interaction with Krahenbuhl was that he wanted more tramadol, it was not his concern about what his chest pain might otherwise signify.  Leiser has submitted no evidence beyond his own say-so that his chest pains were urgent or required treatment beyond Dr. Fuller's prescriptions.

Having given Leiser the benefit of every factual dispute, the worst that can be said of Krahenbuhl's arguable failure to provide even *more* information than she did to Dr. Fuller is that Krahenbuhl might have fallen below the standard of reasonable care applicable to a nurse reporting to an on-call physician after examining a patient complaining of chest pain and demanding opioids. That could be viewed as negligence, *see, e.g., Seifert v. Balink*, 372 Wis.2d 525, 546 *et seq.* (2017), but "[n]egligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough." *Burton*, 805 F.3d at 785 (quoting *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987)). Krahenbuhl's interaction with Leiser that day and her follow-through with Dr. Fuller would not reasonably support the inference that she deliberately failed to take steps to avoid a substantial risk of serious harm to Leiser.

### E.    Nurse Krahenbuhl's Failure to Provide Clopidogrel on April 20, 2018

This is not to say that there was no gap in Leiser's medical care when he went without his clopidogrel for three days after Dr. Hoffman prescribed it. Certainly, Dr. Brown's belief that Leiser should undergo a second cardiac catheterization suggests that Dr. Brown considered the 3-day delay in Leiser starting clopidogrel potentially problematic. Yet that does not establish that Krahenbuhl was deliberately indifferent to Leiser's medical condition on April 20, 2018.

It is undisputed that Krahenbuhl recorded the order for Leiser's medication that evening at around 7:30 p.m., and that the medications were not listed as STAT. Therefore, there was no indication that Krahenbuhl had reason to know Leiser needed to receive the medications that same day. Krahenbuhl's failure to fill the prescription that day could be perceived to be negligent, but not deliberate indifference. Indeed, numerous courts have found that "an

36

isolated mistake does not allow a plausible inference of deliberate indifference." *Robbins v. Waupun Corr. Inst.*, No. 16-cv-1128, 2016 WL 5921822, at *3 (E.D. Wis. Oct. 11, 2016) (collecting cases); *Blake v. Warner*, No. 17-cv-220-bbc, 2018 WL 3075832, at *4 (W.D. Wis. June 21, 2018) ("[A]lthough Johnson made a mistake in failing to review plaintiff's records more carefully, nothing in the record suggests that her mistake was the result of deliberate indifference."), *aff'd*, 756 F. App'x 653 (7th Cir. 2019); *see also Burton*, 805 F.3d at 785 ("[W]ithout evidence that defendants acted with requisite bad intent in delaying the dispensation of his medication, Burton's allegations are insufficient to sustain a deliberate indifference claim.").

Leiser disagrees, but he has not submitted any evidence suggested that Krahenbuhl had ill-intent or that she knew or had reason to know about the urgency of Dr. Hoffman's orders when she failed to fill his prescription for clopidogrel that day.  First, it is undisputed that Dr. Hoffman did not label the prescriptions STAT, so there is no obvious reason to fault Krahenbuhl for not expediting the orders.[11]  Leiser points to Krahenbuhl's comment that she didn't know anything about his medications, followed by her decision a little over two hours later to note the order rather than handle the orders as more urgent.  Yet the most damning inference to be drawn from her statement is that Krahenbuhl was reckless in failing to investigate the urgency of the prescriptions when she saw them a few hours later.  The prescriber's orders she made the note on showed *only* the prescriptions Dr. Hoffman wrote that

---

[11] Even assuming that Dr. Hoffman's failure to label the prescription "STAT" was negligent, this failure does not support an inference of deliberate indifference.  Regardless, Krahenbuhl cannot be held accountable for failing to process his order that day differently.  *See Shaw v. Vasquez*, No. 18-cv-158-JPS, 2019 WL 4572883, at *4 (E.D. Wis. Sept. 20, 2019) (finding that HSU staff's failure to process a prescription for clopidogrel immediately -- resulting in a one-week delay -- did not support an inference of deliberate indifference, since the prescription was not marked "stat").

day (*see* Ex. 1000 (dkt. 35-1) 47), they are not a detailed accounting of the stent placement, the orders were not labeled STAT, and Dr. Hoffman did not use any other language signaling a need for Leiser to start taking those medications that night. Leiser hasn't come forward with evidence indicating Krahenbuhl knew that the prescriptions were urgent, that she was aware of his stent placement that day, or that she made any statements hinting that she simply did not care about Leiser's condition. Therefore, no reasonable fact finder could conclude that Krahenbuhl's failure to ensure that Dr. Hoffman's orders were filled on April 20 amounted to deliberate indifference. Accordingly, Krahenbuhl is entitled to judgment in her favor on both of Leiser's claims against her.

### F.    HSU Manager Barker's Handling of Leiser's Reports of Chest Pain in March 11, 2018, HSR

Barker is entitled to judgment in her favor because no evidence of record suggests that she knew about Leiser's March 11, 2018 HSR. To be held liable under § 1983, a plaintiff must prove the defendant's personal participation or direct responsibility for the constitutional deprivation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016). More specifically, "a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728).

Leiser believes that his phrasing in the HSR should have prompted the triaging nurse to forward the communication to Barker, as a request for information rather than for treatment. Although Leiser may disagree with the manner in which Gohde triaged his request, he has not submitted any evidence indicating that she exercised her professional judgment inappropriately in her response, and in any event Gohde is not a defendant in this lawsuit. In other words,

what Gohde should have done with the HSR is immaterial to the question of what *Barker* knew about Leiser's HSR complaining about the discontinuation of his tramadol.

Leiser further argues that Barker should be held accountable in her capacity as the HSU manager when he was complaining about chest pain.  "Section 1983 does not establish a system of vicarious responsibility.  Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise."  *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (citation omitted).  Therefore, "for a supervisor to be liable, they must be 'personally responsible for the deprivation of the constitutional right.'"  *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Chavez v. Illinois State Police,* 251 F.3d 612, 651 (7th Cir. 2001)).  To establish personal involvement, the supervisor must "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'"  *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).  This brings us back to Leiser's failure to come forward with any evidence suggesting the Barker knew that Leiser was complaining about chest pains.  Her lack of knowledge of Leiser's complaint entitles her to judgment in her favor.

CONCLUSION

There is no doubt that, for quite some time, Jeffrey Leiser has suffered from many serious medical conditions and that he has not been pleased with how the DOC's medical staff have responded to those conditions. Leiser filed his first Eighth Amendment lawsuit in this court in 2011, complaining about how staff at Waupun Correctional Institution treated his bad back and the pain resulting from it. *See Leiser v. Schrubbe*, 11-cv-254-slc, dkt. 1. I denied (for the most part) the State's motion for summary judgment, and Leiser went to trial in November 2012, with the jury returning a verdict in favor of all nine defendants, *see id.*, dkt. 137. In May 2015, Leiser filed a lawsuit complaining about how staff at Stanley Correctional Institution had treated his chronic pain due to disc herniation. *See Leiser v. Hannula*, 15-cv-328-slc. In 2017, I granted in part and denied in part the State's motion for summary judgment and we are set for a jury trial this coming October after a failed attempt to recruit an attorney for Leiser.[12] In short, Leiser gets his day in court when he is entitled to it.

This is not one of those cases. The evidence shows that Leiser received continuous medical care to address his chronic pain, reports of chest pain, and need for medical care. Although Leiser can point to a few instances in which his providers may not have provided the best or most thorough care possible at the time, these few miscues and gaps were not the product of a failure to exercise medical judgment or a conscious disregard of Leiser's need for treatment. Accordingly, I am granting defendants' motion, entering judgment in their favor, and closing this case.

---

[12] Leiser also filed lawsuits in 2015 and 2016 complaining about his treatment at the hands of nonmedical staff at Stanley Correctional Institution, *see Leiser v. Kloth*, 15-cv-768-slc and *Leiser v. Canziani*, 16-cv-860-slc.

ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment (dkt. 32) is GRANTED.

2.  Plaintiff Jeffrey Leiser's motion to strike (dkt. 31) is DENIED at moot.

3.  Defendants' motion to amend briefing schedule (dkt. 51) is DENIED as moot.

4.  The clerk of court is directed to enter judgment in defendants' favor and close this
    case.

Entered this 8th day of September, 2020.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge